Juan F. FABRI, Sr., and Juan F. Fabri, Jr., d/b/a Juan F. Fabri, Plaintiffs–Intervenors–Defendants–Appellees–Cross–Appellants,

v.

UNITED TECHNOLOGIES INTERNATIONAL, INC., United Technologies Corporation and Sikorsky Aircraft Corporation, Defendants–Appellants–Cross–Appellees,

Bogle & Gates, PLLC, Intervenors–Plaintiffs.

Docket Nos. 03–7090(L), 03–7249(XAP).

United States Court of Appeals, Second Circuit.

Argued: April 1, 2004.

Decided: Oct. 21, 2004.

864

Evan A. Davis, Cleary, Gottlieb, Steen & Hamilton, New York, N.Y. (Beth M. Sasfai, on the brief), for Defendants–Appellants–Cross–Appellees.

Edward T. Krumeich, Ivey, Barnum & O'Mara, LLC, Greenwich, CT (Al Van Kampen, Rohde & Van Kampen PLLC, Seattle, WA, on the brief), for Plaintiffs–Intervenors–Defendants–Appellees and Cross–Appellants.

Before: FEINBERG, CABRANES, and POOLER, Circuit Judges.

POOLER, Circuit Judge:

Like Humpty Dumpty, a jury verdict once broken is difficult to put together again. At least, it is difficult to refashion the verdict in a way that accords each party substantial justice. Hence, elementary considerations of fairness support certain procedural obstacles to challenges to a jury's verdict. For instance, a party who fails to object to the sufficiency of the evidence on a particular claim may lure his opponent into failing to present evidence that would cure the asserted defect. The Federal Rules provide a prophylactic against such a strategy by requiring that a party make its sufficiency challenges with some specificity before the other party rests. See Fed.R.Civ.P. 50(a)(2). Similarly, allegedly inconsistent verdicts do not necessarily imply that the jury erred by rendering a verdict favoring plaintiff. Instead, the jury may have made an error favoring defendant, or there may be no real inconsistency. Thus, a party concerned about the possibility of an inconsistent verdict must challenge the court's charge or projected verdict sheet before submission to the jury. See Fed.R.Civ.P. 51(d) (allowing a party to claim error based on a charge only if it timely objected to the charge at trial). If a party does not object before the jury retires to consider its verdict, we ordinarily will not consider the argument on appeal. On this appeal, defendants seek reversal on bases that they did not properly place before the district court. Finding no reason to excuse their defaults, we refuse to consider their arguments.

## BACKGROUND

Juan F. Fabri, Sr. ("Fabri, Sr.") and Juan F. Fabri, Jr. ("Fabri, Jr.") do business as Juan F. Fabri (collectively, the "Fabris"). For over thirty years, the Fabris acted as sales representatives in Argentina for Sikorsky Aircraft Corporation ("Sikorsky"), whose parent is United Technologies, Inc. ("UTI"), and for various other UTI-affiliated entities. Each year the Fabris entered into a Sales Representation Agreement ("SRA") with UTI to make sales on behalf of Sikorsky and other UTI entities (collectively, "defendants"). Pursuant to the SRA in effect at the time of the events under review, the Fabris would receive "commissions and/or other compensation" from UTI in exchange for selling UTI's products. Further, the Fabris warranted and represented to UTI that

[n]one of such commissions nor any other money or thing of value has been or will be paid, offered, given or promised by the Representative, his agents or employees, directly or indirectly, to:

. . . . .

(c) any political party or official thereof, any candidate for political office, or any officer or employee of any government or of any instrumentality controlled by any government, or any person acting on behalf of any government or any instrumentality controlled by any government, for the purposes of:

(I) [i]nfluencing any act or decision of such party, official, candidate, officer, employee, or person in his or its official capacity;

(ii) [i]nducing any such party, official, candidate, officer, employee, or person to use his or its influence with a government or government controlled instrumentality to affect or influence any act or decision of such government or government controlled instrumentality,

in order to promote sales of [the companies'] products or otherwise to assist

[the companies] in any aspect of [their] business.

The agreement authorized either party to terminate it on thirty days written notice. In addition, UTI and its subsidiaries had a unilateral right to immediately terminate the agreement under several circumstances, including when "UTI has reason to believe that the representations and warranties made by the [Fabris and quoted above] are no longer valid." Upon termination, UTI or its affiliate had no obligation to pay a commission on any sale the Fabris had arranged unless a sales contract had been signed before the termination. These provisions were included in the SRA to protect Sikorsky and other UTI companies from liability under the Foreign Corrupt Practices Act ("FCPA"), Pub.L. No. 95–213, 91 Stat. 1494 (1977), as amended, codified in pertinent part at 15 U.S.C. § 78dd–2 (imposing liability on companies that pay commissions to sales representatives while knowing that all or part of the commission will be used to bribe a foreign official).

On November 24, 1993, defendants terminated the SRA purportedly because "[v]arious discussions that [they] had with [the Fabris] during the course of the [prior] three weeks had given [defendants] reason to believe that [the Fabris had] violated the terms of [the Fabris' warranty not to pay or agree to pay any portion of their commission as a bribe]." At the time, the Fabris were negotiating with Argentinian president, Carlos Saul Menem, for the purchase of one of Sikorsky's S–70A helicopters. After terminating the Fabris, Sikorsky continued negotiations with Argentinian officials, who ultimately agreed to purchase the helicopter on the terms and conditions that had been proposed by the Fabris. In September 1994, Sikorsky delivered the helicopter, for which it was paid almost $16 million.

On November 21, 1996, the Fabris filed a complaint in the United States District Court for the District of Connecticut. Their claims included breach of contract, promissory estoppel, unjust enrichment, quantum meruit, tortious interference, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. St. § 42–110a *et seq.*, breach of the duty of good faith and fair dealing, and invasion of privacy.

Prior to trial, the Fabris withdrew their invasion of privacy claim. At the beginning of the trial, Judge Dorsey dismissed the breach of good faith claim, finding that it was not a cause of action independent of the breach of contract claim. The judge also determined that the jury would not consider unjust enrichment. Finally, he limited the jury's consideration of the quantum meruit claim.

At the close of plaintiffs' proof, defendants moved, pursuant to Rule 50(a), for judgment as a matter of law. As to the CUTPA claim, they argued: (1) plaintiffs' claims for breach of contract, promissory estoppel, unjust enrichment, and quantum meruit could not support a CUTPA claim; (2) therefore, the viability of the CUTPA claim depended on plaintiffs' claim of tortious interference—i.e., that defendants improperly interfered with plaintiffs' contracts with other businesses; and (3) plaintiffs had not proven tortious interference. Defendants renewed this motion without further argument before the case was submitted to the jury pursuant to Rule 50(b).

The jury found that although plaintiffs had not established their claims for breach of the SRA, promissory estoppel, breach of an oral contract, quantum meruit, or tortious interference, they had proven a CUTPA violation. Despite awarding plaintiffs no compensatory damages, the jury awarded one dollar in nominal damages. Finally, the jury found that defen-

dants' violation of CUTPA was willful, reckless, malicious, or oppressive and that plaintiffs were entitled to $500,000 and legal fees as punitive damages.

After the verdict, defendants renewed their motion for judgment as a matter of law. They argued: (1) the CUTPA verdict should be set aside because the jury found that plaintiffs failed to prove an ascertainable loss, which, defendants argued, is an element of a CUTPA violation; (2) the evidence did not support a CUTPA violation; (3) the jury should not have been allowed to consider punitive damages or attorney's fees because those issues are for the court not the jury; (4) the punitive damage award was legally and factually unsupported; and (5) even it were allowed to stand, the award was excessive. With respect to the insufficiency of the CUTPA evidence, defendants principally argued that because plaintiffs had offered the same factual allegations and evidence on the common law and CUTPA claims, the jury's verdict in defendants' favor on the common law claims mandated dismissal of the CUTPA claim.

The district court denied defendants' motion. It found that the CUTPA claim could be differentiated from plaintiffs' common law claims and that the jury's general verdict rejecting the common law claims did not necessarily reject the factual allegations underlying those claims. The district court also saw no merit in defendants' alternative argument that the jury's failure to award compensatory damages required that the court set aside the liability verdict.

Judge Dorsey also rejected each of defendants' challenges to the punitive damages award. Finally, he found that the jury's assessment that plaintiffs should receive attorney's fees was, at worst, a harmless advisory opinion because the court would consider plaintiffs' attorney's fees motion at a later date.

Defendants subsequently moved for reconsideration on the CUTPA claim based on a recent decision of the Connecticut Supreme Court, *Gomes v. Commercial Union Insurance Company*, 258 Conn. 603, 783 A.2d 462 (2001). The district court denied this motion as untimely, but also found that it lacked merit.

Plaintiffs requested an award of approximately $1.6 million in attorney's fees and expenses based on their CUTPA recovery. The district court awarded slightly more than $600,000 as fees and expenses after making reductions on several different bases.

On appeal, defendants argue: (1) the district court improperly imposed a superfairness standard on their conduct when it found that there was sufficient evidence to support the CUTPA verdict; (2) under the correct CUTPA standard, the jury's conclusion that defendants terminated the SRA in good faith, which was necessary to rule in defendants' favor on the contract claim, precluded a verdict in plaintiffs' favor on the CUTPA claim; (3) in any case, defendants' conduct was not unfair under the "cigarette rule" Connecticut uses to assess CUTPA claims; (4) the district court's interpretation of CUTPA impaired defendants' contractual rights in violation of the Contracts Clause of the United States Constitution, U.S. CONST. art. I, § 10, cl. 1; (5) the district court's interpretation of CUTPA conflicts with the FCPA; (6) the award of punitive damages should be reversed because there was no evidence of malice or wanton disregard of plaintiffs' rights; and (7) in any event, the punitive damages award should be reduced.

On their cross-appeal, the Fabris argue that (1) the district court should not have dismissed the good faith and fair dealing claim; (2) the district court misinterpreted

the law on unjust enrichment and quantum meruit; and (3) the district court erred by reducing the requested attorney's fees.

## DISCUSSION

### I. Defendants' Appeal

**A. Standard of review and procedural requirements.**

The parties' positions implicate both the standard of review of the district court's denial of judgment as a matter of law and two potential procedural bars. The district court's denial of a Rule 50(b) motion is reviewed de novo. *Yurman Design, Inc., v. PAJ, Inc.*, 262 F.3d 101, 108 (2d Cir.2001). The district court can grant the motion only if after viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in favor of the non-moving party, it finds that there is insufficient evidence to support the verdict. *Tolbert v. Queens College*, 242 F.3d 58, 70 (2d Cir. 2001). The district court cannot set aside the jury's credibility findings and cannot find for the movant based on evidence the jury was entitled to discredit. *Id.* We apply the same standards. *Id.*

The first of the potential procedural bars is the general requirement that to make a sufficiency argument on appeal, a party must have challenged the sufficiency of the evidence to support the particular element in question before the jury retires. *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 164 (2d Cir.1998) (citing Fed.R.Civ.P. 50(a)(2)). Notwithstanding the general rule, we may reach the waived issue if to ignore it would result in manifest injustice. *See Id.* We also may correct a purely legal error despite the lack of a timely request in the district court. *Baker v. Dorfman*, 239 F.3d 415, 420 (2d Cir.2000).

The second of the potential procedural bars governs a claim of inconsistent verdicts. As we will explain, defendants implicitly argue that the verdicts dismissing plaintiffs' other claims, especially the contract claim, and the verdict sustaining the CUTPA claim are incurably inconsistent. When a charge or verdict sheet may lead to inconsistent verdicts, a party must object before the jury begins its deliberations. *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56–57 (2d Cir.2002) (citing Fed.R.Civ.P. 51). If a timely objection is not made, the failure can be excused only if the district court committed a "fundamental error," a standard that is more stringent than the plain error standard applicable to criminal appeals under Federal Rule of Criminal Procedure 52(b). *Id.* at 62.

### B. CUTPA liability.

CUTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. St. § 42–110b(a). "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42–110b, may bring an action" to recover actual damages, punitive damages, and equitable relief. Conn. Gen. St. 42–110g(a). Subsection (d) of Section 42–110g allows the court to award "costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery."

CUTPA is to be construed in accord with interpretations by the Federal Trade Commission and by the federal courts of the Federal Trade Commission Act. Conn. Gen. St. § 42–110b(b). Thus, Connecticut has adopted the Commission's "cigarette rule" to determine whether a

practice is unfair under CUTPA.[1] The factors to be weighed under the cigarette rule are

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)].

*Cheshire Mortgage Serv. Inc. v. Montes,* 223 Conn. 80, 612 A.2d 1130, 1143 (1992). A CUTPA plaintiff need not establish all three criteria to demonstrate unfairness. *Id.* Instead, a practice may be shown to be unfair either "because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* at 1143–44 (internal quotation marks omitted). The practice attacked may be actually deceptive "or a practice amounting to a violation of public policy." *Id.* at 1144. The plaintiff need not show intent to deceive. *Id.*

■ Defendants make three attacks on the CUTPA verdict. First, they argue that because the jury found in their favor on all of the common law grounds, it could have found in the Fabris' favor on the CUTPA claim only by imposing a super-fairness standard. Defendants' argument is subtle and complex, but it ultimately founders on their failure to object to the charge and verdict sheet. Defendants begin by noting that the district court instructed the jury that to defeat the con-

tract claim, defendants must establish that they had a good faith reason to believe that the Fabris had breached the warranties in the SRA. Defendants then reason that, absent a super-fairness standard, they could not have violated CUTPA without also breaching their duty of good faith and fair dealing under the contract.

With respect to the contract claim, the court charged the jury:

> The contract provides that defendants may terminate the contract when in the exercise of good faith and fair dealings they have reason to believe that the plaintiffs violated the sales representation agreement by payment, offer or promise of money or thing of value to an Argentine official.

> In determining whether the plaintiffs were entitled to payment under the contract, you must determine whether the defendants have proven that they had good-faith reason to believe that plaintiffs violated the sales representation agreement.

With respect to the CUTPA claim, the court charged that the plaintiffs must prove "an unfair or deceptive act or practice by defendants." It further instructed:

> There have been certain guidelines established to help you decide what constitutes an unfair trade practice.

> One, whether the practice, though not previously considered unlawful, offends a public policy established by statutes, common law or otherwise. Whether, in other words, it is within the scope of a

---

1. The Connecticut Supreme Court first used the term "cigarette rule" in *McLaughlin Ford, Inc. v. Ford Motor Co.,* 192 Conn. 558, 473 A.2d 1185 (1984), to refer to a 1964 Federal Trade Commission publication listing the factors to be considered in determining whether a practice that is neither deceptive nor a violation of antitrust law is nevertheless unfair. *See* Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking. 29 Fed.Reg. 8324, 8355 (1964).

concept of unfairness established by the common law or statutes.

Two, whether it is immoral, unethical, oppressive or unscrupulous.

Three, whether it causes substantial injury to other business persons.

The court then went on to tell the jury that it need not find all three factors, that one present to a great extent might demonstrate an unfair practice, and that in order to prevail on the third factor, the plaintiffs must show that the injury was indeed substantial and that it was not outweighed by benefits of the practice.

Defendants did not object to either the contract or the CUTPA charge, and they did not object to the verdict sheet, which stated the two claims separately and contained no indication that a verdict in defendants' favor on the common law claims mandated the same verdict on the CUTPA claim.

█ Although defendants frame their challenge to the verdict as a challenge to the sufficiency of the evidence, any problem with the verdict is a result of the charge and verdict sheet, which allowed the jury to find in favor of defendants on all of the common law claims, but also in favor of plaintiffs on the CUTPA claim. Because defendants' sufficiency challenge is truly an attack on the consistency of the contract and CUTPA verdicts, defendants were required to object before the jury began its deliberations. *Jarvis*, 283 F.3d at 56–57. Since they did not object, defendants must demonstrate fundamental error in the charge and verdict sheet in order to prevail.[2] *Id.* at 62. "Fundamental error is more egregious than the 'plain' error that can excuse a procedural default in a criminal trial and is so serious and flagrant that it goes to the very integrity of the trial." *Id.* (internal quotation marks and citation omitted).

█ Defendants cannot establish fundamental error because none of the authorities on which they rely—*Gomes v. Commercial Union*, 258 Conn. 603, 783 A.2d 462 (2001); *Rudel Mach. Co. v. Giddings & Lewis, Inc.*, 68 F.Supp.2d 118 (D.Conn.1999); and *McKeown Distribs. v. Gyp–Crete Corp.*, 618 F.Supp. 632 (D.Conn.1985)—establish that the jury's verdict in favor of defendant on the contract claim precluded it from finding for the Fabris on the CUTPA claim. In *Gomes*, the only case from Connecticut's highest court, the court dismissed claims for intentional tort and negligence based on: (1) a hotel desk clerk's failure to notify authorities of a break-in at plaintiffs' gas station after the clerk had assured a guest that she would call and (2) an insurance company's subsequent demand that plaintiffs repay money the company had paid due to plaintiffs' alleged negligence. 783 A.2d at 465. The court then held:

Having determined that the conduct of the desk clerk was not actionable

---

2. Defendants' reliance on their motion for judgment as a matter of law to preserve their inconsistency argument is unavailing. In support of that motion, defendants argued that a verdict in the Fabris' favor on the contract, promissory estoppel, unjust enrichment, or quantum meruit claims would not justify a verdict in their favor on the CUTPA claim. In order to prevail on the CUTPA claim, defendants argued, plaintiffs must show either aggravated conduct associated with the breach of contract or tortious interference, neither of which they had done. This argument is quite different from defendants' current claim that the jury's finding that defendants acted in good faith with respect to their contract obligations precluded the jury from also finding that defendants violated CUTPA. *See Jarvis*, 283 F.3d at 61 (holding that movant must have "clearly apprised" the trial court of the error in the charge and verdict sheet and given the trial court an opportunity to correct its error).

under either an intentional tort or negligence theory, we conclude that the plaintiffs' CUTPA claim similarly must fail because the factual predicate of the claimed unfair or deceptive act or practice, as required by General Statutes § 42–110b(a), does not exist. *Id.* at 473.

Whatever persuasive authority *Gomes* might have in a different procedural context, it does not establish fundamental error. The Connecticut court did not hold that a plaintiff could never prevail on a CUTPA claim if it also failed to prevail on a contract claim in which defendants were assigned the burden of proving good faith. Instead, the *Gomes* court primarily determined "whether, under the circumstances of this case, the defendants owed a duty to the plaintiffs to refrain from preventing a third person from rendering aid to prevent damage to the plaintiffs' properties." *Id.* at 464. Thus cabined, *Gomes* has little precedential force in determining whether the verdicts in this case are incurably inconsistent. It certainly does not establish that fundamental error occurred.

■ *Rudel* and *McKeown* are federal district court decisions. As we have discussed, the fundamental error standard is stricter than the plain error standard that applies when a defendant fails to object to an asserted error in a criminal trial. On plain error review, we "typically will not find such error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this [c]ourt." *United States v. Whab*, 355 F.3d 155, 158 (2d Cir.) (internal quotation marks omitted), *cert. denied,* —— U.S. ——, 124 S.Ct. 2055, 158 L.Ed.2d 519 (2004). Because fundamental

error review is even more deferential than plain error review, we doubt that we could find fundamental error in a district court's action on a state law claim in the absence of clear authority from the state's highest court.

Even if we could, neither *Rudel* nor *McKeown* clearly supports defendants' argument. In *McKeown*, the district court, acting as a fact-finder, rejected a CUTPA claim based on its finding that defendant had good cause to cancel the contract. 618 F.Supp. at 644. However, the court also noted that it was arguable that McKeown could have shown an unfair trade practice simply by showing that the injury it incurred outweighed any benefit to consumers arising from the practice. *Id.* n. 7. Thus, *McKeown* does not rule out a CUTPA claim whenever plaintiff fails to prevail on any of its common law claims. *Rudel* also leaves open the possibility that a CUTPA claim can survive even though the jury finds no breach of contract. 68 F.Supp.2d at 130 ("Even assuming that ... conduct [not in breach of the contract] could give rise to a claim under the second prong of the cigarette rule, to be cognizable it would have to entail a degree of bad faith not shown here.").[3]

Therefore, we hold that defendants waived their challenge to the sufficiency of the evidence supporting the CUTPA claim to the extent that the claimed insufficiency rests on an implication that the jury found no bad faith because it held in defendants' favor on the contract claim. Moreover, we find no fundamental error.

■ Putting aside any inference that might be drawn from the verdict on the contract claim, we must nevertheless determine whether there was sufficient evi-

---

**3.** We, too, have held that a simple breach of contract does not violate CUTPA and that the plaintiff must show aggravating circumstances. *See Boulevard Assocs. v. Sovereign*

*Hotels, Inc.,* 72 F.3d 1029, 1040 (2d Cir. 1995). That holding, however, does not establish that a CUTPA violation cannot occur without a breach of contract.

dence to support the CUTPA claim. *See Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48, 57 (2d Cir.1992) (holding that where defendant waives its objection based on inconsistency in the verdicts, the reviewing court is not limited to considering "the sufficiency of the evidence of [the theory on which the jury found for the plaintiff] which is reconcilable with a finding that the [defendant] is not ... liable" on another theory). Because of defendants' waiver, and because the jury made no findings as to which of plaintiffs' allegations of misconduct it rejected and which it accepted, we must consider all of plaintiffs' evidence of misconduct in determining whether the jury could have properly found a CUTPA violation.

Included in the relevant evidence the Fabris adduced was proof that: (1) they had a thirty-year relationship with defendants in which defendants never had cause to doubt the Fabris' honesty; (2) defendants' investigation of possible misconduct was triggered by Fabri, Jr.'s, report to them of an attempt by an Argentinian government official to corrupt him; (3) defendants knew there were innocent explanations for conduct by the Fabris that defendants viewed as suspicious; (4) defendants terminated the SRA only after the Fabris had effectively obtained the contract for them; (5) after terminating the SRA, defendants offered the Fabris a consulting contract, which required the Fabris to make the same representation that they would not bribe Argentinian officials, but which gave them less compensation than the SRA; and (6) defendants did not reinstate the SRA after the sale went through without a bribe having been paid despite their representative's prior acknowledgment that selling the helicopter without paying a bribe would be substantial evidence of the Fabris' innocence.

As we have discussed, a jury can find a violation of CUTPA if a practice, even if not previously deemed unlawful, offends public policy as expressed in the state's statutes and common law, the conduct is immoral, unethical, or oppressive, and/or it causes substantial harm to a business that outweighs benefits of the practice. *Cheshire Mortgage Serv.*, 612 A.2d at 1143. The Fabris have not identified any statute or public policy that defendants' conduct violated. The jury, however, could have found in the Fabris' favor on the other two CUTPA analysis factors. That is, the jury could have found that defendants' investigation and its post-termination actions were unethical and oppressive. Or, it could have found that defendants' failure to reopen their investigation based on new information caused the Fabris significant economic harm without creating a concomitant benefit, especially in light of the thirty-year relationship between the Fabris and defendants. Although defendants certainly had a right and an obligation to act promptly to protect themselves from FCPA liability, they arguably could have reinstated the SRA after receiving more evidence of the Fabris' innocence without jeopardizing their status as government contractors. The jury also could have found that although defendants were entitled to terminate the SRA under its terms, they acted unethically by taking advantage of the Fabris' labor without paying for it.

Because in considering the sufficiency of the evidence to support the CUTPA verdict, we must set aside the fact that the jury found in Sikorsky's favor on the contract claim, and because the evidence viewed in the light most favorable to plaintiffs is sufficient to support the verdict, we reject defendants' sufficiency/inconsistency argument.

■ Defendants next argue that the district court's interpretation of CUTPA

conflicts with the policies of the FCPA and is thus preempted. Defendants claim that they adequately preserved their preemption defense by: (1) including an assertion in their amended answer that the FCPA compelled them to act as they did; (2) adducing expert testimony concerning their FCPA obligations; and (3) raising the FCPA issue, albeit not specifically preemption, in their Rule 50(b) motion. Defendants point out that it would have made no sense to raise the issue of preemption before the district court held that the jury could have properly interpreted CUTPA as imposing higher standards than the SRA.

Whether or not defendants waived their preemption claim, it lacks merit in light of our disposition of the sufficiency issue. Defendants' argument is triggered by the district court's holding that the jury could have imposed a higher standard on defendants with respect to the CUTPA claim than it did with respect to the contract claim. However, our affirmance of the district court's verdict does not rest on the district court's conclusion. Instead, we have held: (1) we must consider all proof offered in support of the CUTPA claim and not just proof that is consistent with the jury's verdict on the contract claim and (2) viewed in this fashion, the evidence was sufficient to support the CUTPA verdict. Because our analysis does not rest on or require a super-fairness standard, there is no merit to defendants' preemption contention.

■ Finally, defendants argue that allowing the Fabris to recover on the CUTPA claim impaired defendants' rights in violation of the Contracts Clause. Defendants concede that they did not raise an impairment of contracts claim in district court. They argue, however, that this court can nevertheless reach the issue because it is a purely legal one requiring no

additional fact-finding. *See, e.g., Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 142 (2d Cir.2000).

■ Again, defendants could have avoided the procedural dilemma in which they now find themselves by asking the court to charge the jury that plaintiff could not prevail on its CUTPA claim if it found defendants had not breached the duty of good faith implicit in the SRA. Their failure to do so requires us to find fundamental error in the jury charge or verdict sheet to address the purported error. We do not do so for two reasons. First, any error in the district court's analysis is mooted by our conclusion that no super-fairness standard is required to sustain the CUTPA verdict. Second, defendants have not identified any error and certainly have not established fundamental error. The Contract Clause prohibits the impairment by the state of *existing* contracts. *Kinney v. Connecticut Judicial Dep't,* 974 F.2d 313, 314 (2d Cir.1992) (per curiam). Even if it takes a judicial interpretation of a statute to give it unconstitutional effect, the statute must have been passed after the contract was executed. *Id.* at 315. It is undisputed that CUTPA was passed long before the parties entered into the latest SRA. Therefore, there has been no unconstitutional impairment of a contract.

## C. Punitive damages.

■ Defendants argue both that there was no evidence on which the jury could have premised a punitive damages award and that the damages awarded are excessive. Under Connecticut law, punitive damages may be awarded on a CUTPA claim if the evidence "reveal[s] a reckless indifference to the rights of others or an intentional and wanton violation of those rights." *Gargano v. Heyman,* 203 Conn. 616, 525 A.2d 1343, 1347 (1987).

Defendants did not object to the submission of the CUTPA punitive damages claim to the jury. At the close of plaintiffs' case, defendants asked for dismissal of all claims but did not argue in the alternative that, even assuming a claim had been made out, plaintiffs had not shown an entitlement to punitive damages. Before the jury retired to deliberate, defendants simply reiterated the bases on which they had previously moved. Thus, defendants waived any argument that there was insufficient evidence to support a punitive damages award. *Cf. Local Union No. 38 v. Pelella,* 350 F.3d 73, 87–88 (2d Cir.2003) (holding that Union waived its objection to award of punitive damages in absence of award of compensatory damages by failing to object to charge in which judge told jury it could award punitive damages without awarding compensatory damages), *cert. denied,* —— U.S. ——, 124 S.Ct. 2821, 159 L.Ed.2d 248 (2004). Because defendants' argument does not present a claim of purely legal error, *see Baker,* 239 F.3d at 420, and because failure to consider it will not result in manifest injustice, *see Kirsch,* 148 F.3d at 164, we decline to reach the sufficiency question.

We turn instead to defendants' claim that the damages award must be set aside as grossly excessive. "The Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a grossly excessive punishment on a tortfeasor." *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 562, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (internal quotation marks omitted). States may impose punitive damages to further legitimate interests, including the prevention of deceptive trade practices. *Id.* at 568, 116 S.Ct. 1589. However, "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to

punishment, but also of the severity of the penalty that a State may impose." *Id.* at 574, 116 S.Ct. 1589. To determine whether a defendant has been given adequate notice, we look to the so-called *Gore* factors, including "the degree of reprehensibility of the [relevant conduct]; the disparity between the harm or potential harm suffered by [plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* at 575, 116 S.Ct. 1589. We review de novo the district court's conclusion that an award of punitive damages is within constitutional limits. *Cooper Indus. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).

In this case, applying the *Gore* factors will require a new trial on punitive damages unless plaintiffs agree to a reduction, in an amount to be determined by the district court, in their punitive damages. The first factor, the reprehensibility of the defendant's conduct, is "[p]erhaps the most important." *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. In judging reprehensibility, we consider "whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

The criteria for establishing reprehensibility, as applied to this case, cut in different directions. The harm here was economic, rather than physical, and there was no disregard of the health or safety of others. We accept that the Fabris were

somewhat financially vulnerable because an arms embargo had prevented them from doing business in Argentina on defendants' behalf, that the jury could have found that defendants' conduct was intentional and motivated by malice, and that the unfair conduct involved repeated actions rather than an isolated incident. Nevertheless, the conduct in this case differs only in degree from that in a more typical CUTPA claim, and, altogether, the criteria for establishing reprehensibility call into question the amount of punitive damages in this case.

■ The second *Gore* factor—the relationship between actual damages and punitive damages—would, if fully applicable, cut strongly in favor of defendants because plaintiffs received one dollar in nominal damages and $500,000 in punitive damages. However, the very fact that plaintiffs received only nominal damages counsels against reducing their punitive damages award too substantially. Although the *State Farm* Court noted that "[s]ingle-digit multipliers are more likely to comport with due process ... than awards with ratios in [the] range of 500 to 1," it also recognized that this proposition may not apply where the plaintiff receives an insignificant or nominal compensatory award. *State Farm*, 538 U.S. at 425, 123 S.Ct. 1513. In considering a punitive damages award where the jury awarded no compensatory damages and only one dollar in nominal damages, we said:

In *Gore*, a 500 to 1 ratio was "breathtaking." However, in a § 1983 case in which the compensatory damages are nominal, a much higher ratio can be contemplated while maintaining normal respiration. Since the use of a multiplier to assess punitive damages is not the best tool here, we must look to the punitive damage awards in other civil

rights cases to find limits and proportions.

*Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir.1996).

■ Applying the third *Gore* factor, which examines civil penalties available for similar violations, further persuades us that the punitive damages award is excessive. CUTPA provides that the Attorney General of Connecticut may recover a civil penalty of $5,000 for each willful CUTPA violation. Conn. Gen. St. § 42–110*o* (b). That sum is 1/100 of the punitive damages awarded here. However, civil verdicts also are relevant, *see Lee* 101 F.3d at 811, at least where there is some parity between the injuries suffered by the plaintiff in the case under review and those suffered by the plaintiffs in the cases being compared, *see id.* at 812–13 (reducing award because plaintiff received damages solely on his malicious prosecution claim and his award exceeded punitive damages given to plaintiffs who suffered severe physical and psychological harms).

We have found no case in which a Connecticut court approved a punitive damages award of the magnitude approved by the district court here in which there was neither bodily injury nor a pattern of misconduct by the defendant that affected entities other than the plaintiffs. The largest punitive damages award we have found for solely economic loss without allegations of pattern and practice is approximately $340,000. *See Advanced Fin. Servs. v. Associated Appraisal Servs.*, 79 Conn.App. 22, 830 A.2d 240, 249 (2003). However, *Advanced Financial* differs from this case in two significant respects. First, the court awarded compensatory damages in the amount of half the punitive damages award. *Id.* at 250. Second, the Connecticut court found that defendants committed actual fraud, rather than the aggravated

sharp dealing the jury in this case permissibly could have found. *Id.* at 246.

Based on our consideration of all the *Gore* factors, we hold that a corporation such as UTI or Sikorsky would not have been on notice that its conduct could trigger a punitive damages award of $500,000. We therefore hold that the punitive damages award is so excessive as to have denied defendants due process. Because the district court is far more familiar with this case than this court, we vacate the punitive damages award and remand for the district court to set the appropriate remittitur amount. *See Smith v. Lightning Bolt Prods.*, 861 F.2d 363, 375 (2d Cir.1988).

## II. The Cross–Appeal

The Fabris contend that the district court erred by: (1) dismissing sua sponte their breach of good faith and fair dealing claim; (2) dismissing their claims for unjust enrichment and quantum meruit; and (3) reducing their award of attorney's fees.

## A. Good faith and fair dealing.

■■■ The Fabris contend that a breach of the duty of good faith and fair dealing is an independent claim under Connecticut law. Further, they assert that the district court's error in dismissing the claim was not cured "by adding the bare words 'good faith,' and the phrase 'good faith and fair dealing' to the instructions on the breach of contract claim." Appellees' Br. at 72.

We are not certain whether Connecticut courts would allow a litigant to proceed on theories of both breach of the implied warranty of good faith and breach of contract. It appears that allowing plaintiffs to plead both claims would be duplicative because the implied warranty of good faith is read into all contracts. *See Celentano v. Oaks Condo. Ass'n*, 265 Conn. 579, 830 A.2d 164, 188 (2003). However, in *Miller v. Gui-*

*maraes*, 78 Conn.App. 760, 829 A.2d 422 (2003), the court upheld, without discussion, liability verdicts for both breach of contract and breach of the implied duty of good faith and fair dealing. *Id.* at 432–33. Even assuming that *Miller* presages a holding that a plaintiff can maintain separate claims for breach of contract and breach of the duty of good faith and fair dealing, the Fabris cannot prevail because they suffered no prejudice. The district court charged the jury that in order to terminate the contract, defendants were required to have held a good faith belief that the Fabris had breached their warranties. The court also charged that Sikorsky must prove that it had a good faith reason for its belief. If anything, plaintiffs, who would have borne the burden of proof on the independent claim, benefitted from the allocation of the burden on the contract claim. Therefore, if the district court erred in refusing to charge the good faith claim separately, its error was harmless as a matter of law and thus not a basis for reversal. *See* 28 U.S.C. § 2111.

Plaintiffs also contend that the trial court denied their request for a charge that would have better explained the obligation to exercise good faith, making it clear that this obligation extended not just to defendants' initial reason for their belief that plaintiffs were engaged in conduct contrary to the SRA, but also to defendants' investigation of plaintiffs. Defendants deny that plaintiffs made any such request. Plaintiffs moved in this court and the district court to supplement the record to reflect the substance of the charge conference, which was not on the record. All of the motions to correct the record were denied. Plaintiffs concede that, absent the charging conference, the record does not contain any objections to the court's charge, which would require us to consider whether the charge caused a fundamental

injustice. Because we conclude that—even if plaintiffs had timely objected to the charge—they have not demonstrated harmful error, much less fundamental injustice, we reject plaintiffs' challenge to the good faith charge.

## B. Quantum meruit and unjust enrichment.

▮▮▮▮ The district court dismissed plaintiffs' unjust enrichment claim with respect to the sale of both the S–70A helicopter, which has been the principal focus of our analysis thus far, and an S–76 helicopter, which plaintiffs claimed was bought by Argentina in 1997 because of their efforts. The court also dismissed plaintiffs' quantum meruit claim with respect to the S–70A helicopter and instructed the jury that it could not find in plaintiffs' favor on the S–76 quantum meruit claim if it found the work performed to sell the S–76 was within the scope of the SRA. The Fabris contend that the district court erred in all these decisions. The district court did not err by dismissing the quantum meruit claim on the S–70A sale and by limiting it on the S–76 sale. "[P]arties who have entered into controlling express contracts are bound by such contracts to the exclusion of inconsistent implied contract obligations." *H.B. Toms Tree Surgery, Inc. v. Brant,* 187 Conn. 343, 446 A.2d 1, 3 (1982). Because an express contract governed the relationship between the Fabris and defendants, the quantum meruit claim was appropriately rejected.

▮▮▮▮ Unjust enrichment applies even where the parties have an express contract *if:* (1) the plaintiff cannot recover under the contract because the plaintiff is guilty of breach of contract, and (2) the defendant would nevertheless be unjustly enriched by keeping the plaintiff's services or money without some payment. *Vines v. Orchard Hills, Inc.,* 181 Conn. 501, 435 A.2d 1022, 1028 (1980) ("The purchaser must show more than that the contract has come to an end and that the seller retains moneys paid pursuant to the contract. To prove unjust enrichment, in the ordinary case, the purchaser, because he is the party in breach, must prove that the damages suffered by his seller are less than the moneys received from the purchaser.").

Here, the proof presented to the jury focused on whether defendants had a reasonable good faith belief that the Fabris' warranties were no longer valid. Defendants did not attempt to prove that the Fabris actually breached the SRA, and the Fabris certainly did not admit to a breach. Therefore, the Fabris were not entitled to an unjust enrichment charge.

## C. Attorney's fees.

The Fabris claim that the district court erred in calculating attorney's fees by: (1) reducing their uncontested claimed hourly rates; (2) halving hours worked on claims clearly interrelated with the CUTPA claim; (3) denying all fees for a second senior attorney at trial; (4) not allowing fees related to polygraph evidence, which allegedly demonstrated that Fabri, Jr. neither offered nor paid a bribe; (5) double discounting; and (6) making miscellaneous calculation errors. Defendants suggest that if this court eliminates or significantly reduces the punitive damages verdict, it also should remand for recalculation of fees in light of the Fabris' diminished success.

▮▮▮▮ In a CUTPA lawsuit, the trial court "may award, to the plaintiff, . . . costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery." Conn. Gen. St. § 42–110g(d). The award is committed to the discretion of the trial court, "and the exercise of such discretion will not ordinarily be interfered

with on appeal unless the abuse is manifest or injustice appears to have been done." *Gargano v. Heyman,* 203 Conn. 616, 525 A.2d 1343, 1347 (1987).

■ Plaintiffs requested almost $1.6 million in attorney's fees. Judge Dorsey first reduced the hourly rate for partners from a requested maximum of $275 an hour to a maximum of $225 per hour, the hourly rate for associates from a requested maximum of $170 per hour to a maximum of $150 per hour, the hourly rate for paralegals, summer associates, and interns from an unknown maximum to $75 per hour, and the hourly rate for litigation support to $40 per hour. These rate reductions resulted in the subtraction of $167,866 from the requested fee award. Judge Dorsey acknowledged that plaintiffs supported their fee requests with an affidavit from a Connecticut attorney who "stat[ed] that the rates charged by Plaintiffs' counsel were reasonable and comparable to rates charged by similar firms engaged in complex litigation." The judge noted, however, that the attorney did not claim that the individual attorneys involved in the litigation deserved such rates. Judge Dorsey rested his reduction not on record evidence but rather on his own assessment that the plaintiffs' attorney's fees were higher than those prevailing in the area and on his observation of the trial proceedings.

The Fabris contend that it was an abuse of discretion for the judge to discount their hourly rates because there was no evidence to the contrary, but the Connecticut Supreme Court has "repeatedly held that courts have a general knowledge of what would be reasonable compensation for services which are fairly stated and described. Not only is expert testimony not required, but such evidence, if offered, is not binding on the court." *Piantedosi v. Floridia,* 186 Conn. 275, 440 A.2d 977, 980 (1982) (inter-

nal quotation marks omitted). Therefore, the hourly rate reduction was well within the discretion accorded to the district court.

■ After reducing hourly rates, the district court made reductions in the hours of attorney time that plaintiffs claimed. We discuss only those reductions that the Fabris contest. Although defendants challenged the time the Fabris' attorneys spent on any claim other than the successful CUTPA claim, the court refused to eliminate hours spent on the Fabris' claims for breach of written contract, breach of the duty of good faith and fair dealing, and unjust enrichment because these claims "were factually intertwined with [the] CUTPA claim." However, the court found that the claims for "breach of oral contract (related to the S–61 helicopter sale), promissory estoppel (related to the S–61 helicopter sale), quantum meruit (related to the S–76 helicopter sale), tortious interference with business relations, equitable estoppel, and invasion of privacy were not factually intertwined with these other claims and were not meritorious." It held that awarding fees for the time spent on those claims would neither be appropriate nor "reasonable" within the meaning of CUTPA. The court found that, within the parameters it had set, approximately 50% of the time entries were not related to the CUTPA claim. The court therefore reduced the requested fee by an additional $215,279.

The Fabris contend that because all their claims were factually intertwined, no reduction was merited. However, they fail to explain how the claims are interrelated. Instead, they rely principally on their incorporation of all factual allegations to support their CUTPA claim and on the district court's conclusion that plaintiffs could rely on all of their evidence to avoid

judgment as a matter of law on the CUTPA claim.

A trial court can compensate a plaintiff for attorney hours spent on unsuccessful claims as long as those claims are related to the CUTPA claim and there is no reasonable basis for segregating the hours. *See Bristol Tech. Inc., v. Microsoft Corp.*, 127 F.Supp.2d 64, 70 (D.Conn.2000). However, "the court can award attorney's fees under CUTPA only for those expenses that were related to the prosecution of a CUTPA claim. Great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness." *Jacques All Trades Corp. v. Brown*, 57 Conn.App. 189, 752 A.2d 1098, 1105 (2000) (internal quotation marks and indicators of alterations from the original omitted).

In this case, the district court's reliance on facts proven in support of other claims to justify the CUTPA verdict does not establish that those claims were interrelated with the CUTPA claim. It was reasonable for the judge to conclude he must consider all proof adduced on all claims in determining whether to set aside the jury's verdict and yet find on the attorney's fees motion, which was committed to *his* discretion, that certain legal claims were not significantly related to the CUTPA claim. Therefore, he did not abuse his discretion by reducing the verdict to account for hours spent on these non-CUTPA claims.

Two senior attorneys and one junior attorney represented the Fabris at trial. Judge Dorsey refused to compensate the Fabris for the services of the second senior attorney. He found that only two attorneys were necessary "for the prosecution of this case." Disallowing the services of one senior attorney resulted in a reduction of $45,575 from the attorney's fee award. Plaintiffs contend this reduction was an abuse of discretion because "[t]he

case plainly required three attorneys" and "Sikorsky usually had *four* attorneys in the courtroom." Appellees' Br. at 89. The number of attorneys reasonably necessary to prosecute a claim is best judged by the trial court, which actually observes the roles played by the attorneys at trial. Therefore, we have no basis for holding that the trial court abused its discretion when it denied fees for a second senior attorney.

Judge Dorsey would not allow attorney's fees and expenses relating to the polygraph testing of Fabri, Jr. He found that "[t]he Fabris do not adequately explain why the expenses were reasonable, aside from conclusory assertions that the polygraph exams were 'important' and 'significant' to aid settlement discussions and to speculation that they may have enticed Defendants to withdraw an affirmative defense." He also found the fees "excessive" and "pertain[ing] to evidence that is not admissible and thus unnecessary in that regard." He therefore deducted the $35,105 attributable to the polygraph evidence from the fee and expenses award.

Plaintiffs contend that Judge Dorsey plainly erred in reaching this conclusion because the results were relevant to show that defendants had conducted a flawed investigation. They also argue that the polygraph results, which allegedly demonstrated Fabri, Jr.'s innocence, caused Sikorsky to withdraw its affirmative defense that it would have been impossible under the FCPA to pay the Fabris a commission. The district court did not abuse its discretion by concluding otherwise and disallowing the fees and expenses.

Finally, the Fabris urge that the district court failed to factor in earlier reductions when it made later ones and made other calculation errors. Because we vacate the punitive damages award,

plaintiffs may apply to the district court on remand to correct any miscalculations that may have occurred. However, we decline defendants' request that we allow the district court to reduce the attorney's fees award in light of the contemplated reduction in the punitive damages award. CUTPA instructs us not to base the attorney's fees award on the amount of a party's recovery. *See* Conn. Gen. St. § 42–110g(d).

## CONCLUSION

The liability verdict is affirmed. We vacate the award of punitive damages and remand in order that the district court can set a remittitur amount by applying the *Gore* factors. Should plaintiffs refuse to accept the reduced damages award, a new trial on punitive damages will be necessary. The district court shall also consider any request plaintiffs may make for a correction of calculation errors in the attorney's fees award.